ATLAS PORTLAND CEMENT CO. v. HOPPER.

(Supreme Court, Appellate Division, First Department. December 28, 1906.)

DAMAGES—LOSS OF PROFITS—BREACH OF CONTRACT—SALES.

A contractor for the erection of a building placed an order for cement with a firm composed of himself and others, and subsequently such firm ordered cement from a company engaged in the manufacture of the same; and, after delivering a portion of the cement contracted for, the company failed to carry out the contract. It appeared that the firm did not order from the company all the cement that would be needed by the contractor, and that similar cement could be procured from other sources, and that while the company knew that the firm had a contract with the contractor, and the purpose for which the cement was to be used, it was not shown that the company knew how much the firm were to receive from the contractor for the cement delivered. Held, that the measure of damages was not the profits which the firm would have made out of the contract, but the difference between the value of the cement not delivered and the market price.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Damages, §§ 58, 59, 74–77; vol. 43, Sales, §§ 1195, 1196.]

Appeal from Judgment on Report of Referee.

Action by the Atlas Portland Cement Company against Isaac A. Hopper. From a judgment in favor of defendant, plaintiff appeals. Reversed.

Argued before PATTERSON, P. J., and McLAUGHLIN, INGRAHAM, CLARKE, and HOUGHTON, JJ.

Henry B. Corey, for appellant.
Alexander Thain, for respondent.

McLAUGHLIN, J. This case came before the court upon a stipulation consolidating two actions—one brought by the plaintiff, a foreign corporation, against a firm known as Hoagland & Robinson, to recover the purchase price of cement sold and delivered, and the other by Henry P. Robinson, as the assignee of that firm, against the Atlas Cement Company, another foreign corporation, to recover damages for the alleged breach of a contract in failing to deliver cement according to its terms. The plaintiff, according to the stipulation, has succeeded to all the rights and liabilities of the Atlas Cement Company, and the defendant has become subrogated to all the rights of the firm of Hoagland & Robinson and Henry P. Robinson, its assignee; the purpose of the stipulation evidently being to have the questions raised in both actions settled and determined by one trial.

There was no dispute between the parties at the trial as to the amount which the plaintiff was entitled to recover for cement sold and delivered; the question litigated being the amount of damage, if any, which the defendant was entitled to recover for the breach of the contract referred to. The referee found in favor of the plaintiff for the amount claimed by it, with interest from a specified date, and for the defendant the damage his assignors were alleged to have sustained, with interest thereon, and directed judgment for defendant for $5,615.65—the difference between the two claims. This conclusion was based upon a finding that the cement company had broken its contract with Hoag-

land & Robinson, and by reason thereof that firm lost the profits which it otherwise would have made under a contract with the defendant. The evidence justified the finding that there was a breach of contract on the part of the cement company, but notwithstanding that fact I am of the opinion that the judgment must be reversed because the referee adopted an improper measure of damage.

The facts, so far as material, are as follows: In the spring of 1899 the defendant had a contract to erect a power house at Kingsbridge, and he placed an order for 25,000 barrels of cement, at $2.25 per barrel, to be used in this work, with his own firm, Hoagland & Robinson, composed of himself and Henry P. Robinson. Some time prior to April 24, 1899, Robinson, the defendant's partner, and the manager of his firm, had a conversation with one De Soto Longo, a representative of the cement company, in which Robinson stated that the firm of Hoagland & Robinson had a contract with Hopper to furnish him, at Kingsbridge, 20,000 barrels of cement. On April 24, 1899, an officer of the cement company wrote Hoagland & Robinson, referring to the conversation which Longo had had with Robinson, and offering to deliver 20,000 barrels of Atlas cement at Kingsbridge, in 500 to 1,000 lots, at $1.82 per barrel, which offer Hoagland & Robinson a few days later accepted. Under the contract thus made, deliveries were made June 6th and 20th, July 15th and 31st, and October 26th, amounting, in all, to 2,200 barrels, and the cement then delivered was paid for, but in each instance the payment was delayed until after the 60 days' credit mentioned in each invoice had expired. Further deliveries, amounting, in all, to 1,100 barrels, were made November 4th, 8th, and 10th, making, in all, 3,300 barrels delivered under the contract. These latter deliveries, however, were not paid for, and plaintiff's recovery was for these shipments and for cement delivered during the month of November at places other than Kingsbridge. There is some evidence to the effect that complaints were made, from time to time, by reason of delays in furnishing the cement, and in this connection a letter dated August 16th from Robinson elicited a reply from the cement company to the effect that the firm had better pay its bills more promptly if they desired prompt shipment, as better care was taken of customers who followed this course than of those who did not. On September 2d following, the cement company threatened to discontinue deliveries unless the balance then due for cement delivered was paid, and on the 18th of October the cement company wrote a letter, stating that it would make deliveries if the unpaid amount for previous deliveries were paid. The correspondence culminated in a letter of November 10th, which was to the effect that no deliveries would be thereafter made when invoices were past due, and that the firm's credit from that time on was limited to $4,000, and if the account reached that sum, payments on deliveries already made must be anticipated in order to secure further deliveries. On November 15th Hoagland & Robinson wrote the cement company that unless it furnish 600 barrels per day from then on it would be compelled to go into the open market and purchase cement, making the best arrangement it could, and in that event it would look to the cement company for the damages sustained. The only reply which the cement company made to this letter was a reiteration of the communication of

November 10th. Just prior to the receipt of the last two letters referred to, the defendant had written Hoagland & Robinson that unless it complied more promptly with his orders for cement he would go into the open market and buy cement at the best price he could, charging any damage that was sustained to the firm.    The letters which passed between the cement company and Hoagland & Robinson, forming the contract between the parties, did not mention the terms of payment. Each invoice, however, stated that credit was given for 60 days, and this. it may be assumed, was a part of the contract, and, notwithstanding it appears that Hoagland & Robinson had defaulted in their payments for cement delivered prior to November 1st, it is clear the cement company continued making deliveries when payments were in arrears, even after the conversation of August 10th referred to, when the firm agreed to keep their account balanced if the cement company would keep making deliveries.    The first act of repudiation, therefore, on the part of the cement company occurred on November 10th, when it wrote Hoagland & Robinson, limiting their credit to $4,000—a situation apparently never contemplated by the parties, and on that date the firm was not in default.    There is nothing in the record to show that all of the cement delivered prior to that time had not been paid for.    The evidence, therefore, is sufficient to justify the finding of the referee that the cement company broke its contract by failing to make deliveries according to its terms, and the sole question presented is what is the proper measure of damage.    The referee held that it was the profits which the firm of Hoagland & Robinson would have made out of the contract which it made with one of its own members, Hopper, and in this I think he erred.    The general rule by which damages for breach of a contract of sale are measured is the difference between the contract price and the market price of the article at the time and place of delivery.    This rule, however, is subject to exceptions, when special damages may be recovered:    (1) Where the article purchased is of a peculiar make or for a particular purpose, having either no market value, or a value much greater to the purchaser than to the public generally; and (2) where the contract unfulfilled was to deliver goods which the seller knows are the subject of an agreement by his purchaser, under the terms of which the latter must deliver these goods, for which he is to obtain an advance price.    In such cases it is held that the purchaser's profit is contemplated by the parties in making the contract, and that they should measure the damages caused by the breach of it.    Booth v. Spuyten Duyvil Rolling Mill Co., 60 N. Y. 487; Boughton v. Petigny, 72 App. Div. 76, 73 N. Y. Supp. 139, 76 N. Y. Supp. 125; Murdock v. Jones, 3 App. Div. 221, 38 N. Y. Supp. 461.

It seems to me clear that this case does not call for the application of either exception to the general rule.    It is true there is some evidence to the effect that the cement was manufactured in part by patented machinery, and was of a special quality; nevertheless, the witnesses and the defendant himself referred to it as having a certain market value, and the evidence fairly sustains the conclusion that it could be procured from sources other than the cement company.

But it is strenuously urged that, as the cement company knew the cement was to be delivered under the defendant's contract with Hoag-

land & Robinson, the profits coming therefrom should constitute the measure of damage. If the company had agreed to furnish defendant with the cement according to the terms of Hoagland & Robinson's agreement with him, being fully informed thereof, and practically taking the contract off Hoagland & Robinson's hands, the special rule would apply, and the measure would be the profits, whether those profits would have been greater or less than if measured by the general rule. Messmore v. New York Shot & Lead Co., 40 N. Y. 422. Here, however, the most that can be said is that the cement company knew Hoagland & Robinson had a contract with the defendant, and wanted the cement delivered at Kingsbridge for that reason; but there is no evidence that the cement company knew how much Hoagland & Robinson were to receive from the defendant for the cement delivered; and to permit the rule of special damage to be applied under such circumstances, where the profits are between a contractor and a selling firm, of which he is a member, would, as it seems to me, be an inducement to seize upon the slightest pretext for claiming a violation of the contract, if it would not be opening the door for fraud in allowing one to practically measure his own damage.

Another fact deserving of consideration, which distinguishes the case from those allowing contract profits, is the fact that the defendant ordered 25,000 barrels of cement from his firm, while the firm contracted with the cement company for only 20,000 barrels; showing that dependence was not placed upon the cement company alone for all of the cement required. In Booth v. Spuyten Duyvil Rolling Mill Co., supra, upon which much reliance is placed by the respondent, it was held that one was liable on his breach of a contract of sale for the difference between the subcontract price and the principal contract price, where he knew the terms of the subcontract, and the fact that he did not know the subcontract price did not prevent a recovery; but it was distinctly stated this was because the article involved did not have a market value, and the intimation is clearly made that if the article had a market price, although a subcontract was contemplated, in that case the general rule would be applicable. All sales of goods to dealers are made with the idea that mutual profits will be made, and breaches of contracts therefor should be governed by the general rule whether the purchaser at the time holds a contract for the immediate sale of the goods, or relies upon the ordinary course of business to dispose of them, unless special circumstances arise, showing clearly a different understanding. Deviations from the general rule are based upon the contemplation of the parties, and there is nothing in this case which shows more clearly the damage contemplated than the letter written by defendant to his firm, stating if it did not furnish the cement more promptly he would secure it in the market, holding it for his damage, and the communication immediately thereafter from the firm to the cement company to the same effect. The firm should have purchased the cement required in the open market, and the increased cost, if any, would be the damage sustained. Rochester Lantern Co. v. Stiles & P. P. Co., 135 N. Y. 209, 31 N. E. 1018. When a person can go into the open market and purchase the article which the seller has failed to deliver, the general rule that the damage is the difference between the contract price and the

market price is the only rule to be applied, as it offers to the buyer full indemnity for any and all loss sustained. Saxe v. Penokee Lumber Co., 159 N. Y. 371, 54 N. E. 14; Parsons v. Sutton, 66 N. Y. 92.

It follows, for the reasons given, that the judgment appealed from must be reversed, and a new trial ordered before another referee, with costs to appellant to abide event.

PATTERSON, P. J., and CLARKE and HOUGHTON, JJ., concur.

INGRAHAM, J. (concurring). I concur with Mr. Justice Mc-LAUGHLIN. I think the proper measure of damages in this case was the difference between the contract price and the price at which the defendant's assignor could have purchased this cement or other cement of equal quality in the market at the time of the breach. There is evidence that this particular kind of cement was only manufactured by the plaintiff, and could only be obtained from it, and that the plaintiff had refused to deliver any more cement to the defendant's assignor: It was then the duty of the defendant's assignor to procure cement of the same brand in the market, and, if that was impossible, to procure cement of the same quality; and the measure of damages would be the difference between the price of such other cement and the price which the defendant's assignor was to pay under the contract.